## In the Matter of the Marriage of

### Shari Joyce NIMAN,
### nka Shari Joyce Clark,
*Respondent,*

*and*

### Dennis Vincent NIMAN,
*Appellant.*

### 0105-64899; A120178

136 P3d 105

Philip F. Schuster, II, argued the cause for appellant. With him on the brief opening were Dierking & Schuster and Gregory P. Oliveros.

Jacqueline L. Koch argued the cause for respondent. With her on the brief was Koch & Deering.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

BREWER, C. J.

## BREWER, C. J.

Husband appeals a judgment of dissolution, assigning error to the child custody, parenting time, property division, spousal support, child support, and attorney fee provisions of the judgment. Husband also appeals a post-dissolution contempt judgment in the same case. Except as otherwise noted, our review is *de novo*. ORS 19.415(3). We vacate and remand the property division with instructions, reverse the spousal support award, affirm the child support award, and reverse the award of attorney fees. Otherwise, we affirm.

The parties were married in 1992, they separated in May 2001, and their marriage was dissolved by a judgment entered in December 2002. At the time of dissolution, wife was 40 years old and husband was 53. Both parties enjoyed good health. The parties have two minor children who were ages nine and six, respectively, at the time of dissolution. The parties disagreed with respect to an appropriate custody and parenting plan for the children. Father sought custody of the children and, in the alternative, a 50 percent parenting plan arrangement. The trial court found that "[m]other is and has been the primary care giver for the children. The children are primarily bonded to her. She is better able to understand and meet the children's needs. The children are also bonded to [f]ather and he is an excellent parent." The court awarded custody of the children to wife, and it awarded husband parenting time consisting, among other terms, of alternating weekend, school holiday, and summer vacation time with the children.

Wife is an attorney. She earned up to $38,000 per year as an ERISA lawyer before the marriage. After the parties' first child was born in 1993, she worked part time for about eight months, and, thereafter, she was a full-time homemaker. When the parties separated in May 2001, wife returned to work outside the home and, at the time of trial, she worked full time as a facilitator in a circuit court family law self-help center. Wife earned $2,193 per month for that work. Wife's goal was to return to law practice as a family law attorney or work in her former field as an ERISA lawyer. The

trial court found that, within two or three years, wife could find employment as a domestic relations attorney earning approximately $3,500 per month.

Husband has degrees in business administration and mechanical engineering. He worked as an engineer for the same employer from 1995 until 2002, when he was laid off due to adverse economic conditions. In 2002, husband's earnings were between $75,000 and $82,000. The trial court found that, since his layoff, husband had made "extensive, vigorous efforts to find employment. His inability to secure employment has been based in part on poor economic conditions, and possibly because of his age. He is conscientious, and will continue to make efforts to become employed." Husband's gross unemployment income at the time of trial was $1,800 per month.

Before the marriage, by his own reckoning, husband had a net worth of $325,815.[1] Wife's premarital debts exceeded the value of her premarital assets. As pertinent here, husband's premarital net worth primarily reposed in three assets. First, husband owned a one-quarter interest in real property in Vancouver, Washington, that he had inherited from his grandmother in 1970. Husband testified that the property consisted of acreage and old buildings with minimal rental value. According to his own calculations, husband's equity in the Vancouver property was $57,060 at the time of the parties' marriage. Title to husband's interest in that property remained in husband's name alone throughout the marriage. According to husband, wife spent perhaps 20 or 30 hours reviewing documents and performing work relating to the property throughout the marriage, and he performed some maintenance work on the property each year. Husband sold the property in 2001. Again according to husband's own calculations, his net equity in the property, after the payment of encumbrances, taxes, and sales expenses, was $102,000. In total, the Vancouver property appreciated approximately $45,000 in value during the course of the marriage.[2] Husband

---

[1] Husband's summary of his premarital assets did not include the Vancouver property that we discuss below. If the premarital equity in that property is included, husband's net worth was more than $380,000.

[2] At trial, wife argued that the correct figure for appreciation of the Vancouver property during the marriage was $60,700. She does not renew that argument on appeal.

asserted that the appreciation was passive, that is, achieved with little or no effort by the parties.

Husband's second major premarital asset was a residence in Portland—the Harold Court property—that he purchased in 1988 for $127,000. At the time of the marriage, the property was worth $182,800, the mortgage balance was $64,566, and husband's net equity was $118,234. Between 1992 and 1993, husband paid off the mortgage with the proceeds of some of his other premarital assets, including, as discussed below, the proceeds of a treasury bill account. At the time of dissolution, the Harold Court property was worth $314,420. The marital appreciation, without taking into account the appreciation created by the mortgage payoff, was $131,620. Including the mortgage payoff, the marital appreciation was $196,186.

Finally, husband owned a $50,000 treasury bill account before the marriage. The proceeds of that account were used to pay off the mortgage on the Harold Court property. Husband established a second treasury bill account during the marriage. Husband exhausted that account, together with other marital assets that husband also liquidated, by paying $44,436 in his own attorney fees, and $12,500 for family support while he was unemployed.[3]

The remainder of the parties' assets are not in dispute on appeal. The trial court awarded husband assets with a total value of $584,576. That award consisted of the following: (1) the proceeds from the sale of the Vancouver property—$44,934; (2) the Harold Court property—$314,420; (3) the second treasury bill account—$51,000; (4) husband's investment and retirement accounts or marital increase in value of such accounts—$170,722; and (5) an automobile—$3,500. Wife received her investment and retirement accounts and a vehicle, which had a combined value of $29,113. The property that the trial court divided thus had a total value of $613,689. To make the division equal, the trial court awarded wife an equalizing judgment of $277,732. The

---

[3] Although the record is not entirely clear, husband may have used the remaining funds for his own living expenses while he was unemployed.

court ordered husband to pay $200,000 at the time of the dissolution judgment and the remaining balance, together with interest at the rate of 9 percent per annum, on or before December 31, 2003. The trial court ordered husband to secure the judgment with a trust deed on the Harold Court property.

After the dissolution, husband filed for bankruptcy. The bankruptcy court later lifted the automatic stay so that husband's appeal could proceed in this case. The parties have stipulated that, after the stay was lifted, the Harold Court property was sold at an execution sale to partially satisfy wife's equalizing judgment in this case. The sale price was $380,000. Wife received $160,000 of the proceeds, $19,667 of the proceeds were segregated for husband's homestead exemption, and the remaining proceeds are being held by the bankruptcy trustee pending the outcome of this appeal and a second appeal from a post-dissolution dispute between the parties. Because the foregoing post-dissolution events have a bearing on the possible mootness of one or more of husband's assignments of error on appeal, we take judicial notice of them. *See* ORAP 8.45 (requiring parties to bring to court's attention occurrence of events pertaining to possible mootness).

At trial, the parties also disagreed about payment of expenses for the children's attendance at a private school. Husband wanted the children to attend public school, and wife believed that they should attend a private school. Husband was concerned that the private school that the children attended was relatively new and not registered with the Oregon Department of Education. Wife's evidence showed that the children had experienced turmoil during the dissolution proceeding, and the trial court concluded that their removal from the private school at that time would cause them trauma. The trial court required husband to pay child support under the guidelines, plus one-half of the children's average monthly private school tuition, in the amount of $283.[4]

---

[4] The children no longer attended the private school after September 1, 2003. In a judgment modification proceeding, the trial court reduced husband's support obligation to the presumptive guidelines amount effective that date. Accordingly, the parties' present dispute pertains only to additional support for tuition that accrued from the date of dissolution until September 1, 2003.

In addition, the parties disagreed about wife's entitlement to spousal support. The trial court ordered husband to pay "transitional spousal support to wife" in the amount of $1 per month for three years so that the court could retain jurisdiction "to modify spousal support if [husband] becomes employed."

Wife sought attorney fees before the trial court in the total amount of $41,774.50. Despite husband's objection, the trial court awarded her attorney fees in the sum of $15,822.82. The court explained:

"The Court considered the criteria set forth in ORS 20.075 and finds, in part, that [husband's] position at trial regarding custody matters was not objectively reasonable. [Wife] was clearly the primary parent. [Husband's] testimony concerning his version of events was not accurate, and he does have anger management problems. With respect to the property issues, [husband's] positions were in good faith, and he did have some support for his legal position."

Finally, as pertinent to husband's appeal, wife brought a remedial contempt proceeding after the entry of the dissolution judgment based on husband's refusal to pay the $1 per month spousal support award, arrearages in his child support obligation, and his refusal to execute the trust deed that the court ordered to secure payment of the equalizing judgment. The trial court found husband in contempt, ordered him to bring his support obligations current, regularly pay them in the future, and execute the trust deed. The court imposed a fine of $500 per month as a remedial sanction for any month in which husband failed to perform those obligations.

On appeal, husband makes nine assignments of error. We reject without extended discussion his alternative challenges to the child custody and parenting time awards. Suffice it to say that, on *de novo* review, we agree that the award of custody to wife was in the children's best interests, as was the parenting time arrangement that the trial court devised. In addition, we accept wife's concession that the trial court erred in making a token award to her of spousal support. *See Ash and Ash*, 61 Or App 595, 598, 658 P2d 540 (1983) ("awards of token spousal support for the purpose of

preserving a basis for future increases are speculative and not based on need"); *Koch and Koch*, 58 Or App 252, 256, 648 P2d 406 (1982) (same). Accordingly, we reverse that award. Husbands' six remaining assignments of error require more extended discussion, and we now turn to them.

In his first and second assignments of error, husband asserts that the trial court erred in awarding wife one-half of the increase in value during the marriage of the Vancouver property and erred in finding that "husband has not rebutted the presumption of equal contribution as to the residence on Harold Court and the Treasury Bills." As a consequence of those errors, husband reasons, the court also erred in awarding an equalizing judgment to wife in the amount of $277,732.

■ ORS 107.105(1)(f) provides, in part, that a court may provide in a judgment of dissolution

"[f]or the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * * The court shall consider the contribution of a spouse as a homemaker as a contribution to the acquisition of marital assets. There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held."

That statute gives the trial court the authority to divide all property of the parties, regardless of whether it was acquired during the marriage. We use the term "marital property" to refer to all of the assets of both parties, regardless of when acquired. However, property acquired during the marriage, or "marital assets," are subject to the rebuttable presumption that "both spouses have contributed equally to the acquisition." Appreciation during the marriage of property brought into the marriage by one spouse also is a marital asset. *Massee and Massee*, 328 Or 195, 206, 970 P2d 1203 (1999).

The appreciation of the Vancouver property during the marriage is a marital asset. The trial court considered it appropriate to divide the appreciation of that property "because marital funds were used for payments" and because "[h]usband was permitted to contribute physically to the

maintenance of the property because of [w]ife's role as the homemaker and caretaker of the children." Husband contends that the trial court erred in finding that marital funds were used for payments and that either party contributed any substantial maintenance to the property so as to increase its value during the marriage. As husband sees things, the marital appreciation in the value of the Vancouver property was passively acquired, and wife's role as a homemaker did not entitle her to share in it. Husband relies on *Kunze and Kunze*, 181 Or App 606, 47 P3d 489 (2002), *aff'd as modified*, 337 Or 122, 92 P3d 100 (2004), where this court and the Supreme Court refused to divide the appreciation in property that "was virtually a passive investment throughout the marriage [where the other spouse] did not contribute in any way to the increase in value." *Id.* at 617-18; 337 Or at 143.

We agree with wife that *Kunze* is factually distinguishable. In this case, unlike in *Kunze*, wife, the nonowner spouse, was a homemaker throughout the majority of the marriage, and she was the primary caretaker of the parties' young children. Before she became a full-time homemaker, wife contributed her income to the family. Husband does not argue that wife's contributions to the family enterprise as a homemaker were insubstantial. To the contrary, the record demonstrates that they were substantial. In *Owens-Koenig and Koenig*, 194 Or App 573, 578, 95 P3d 1152 (2004), *modified on recons*, 195 Or App 734, 98 P3d 1143 (2004), we observed that, when

> "[o]ne spouse holds assets separately, and the other makes a disproportionately greater nonfinancial contribution to the marital estate through homemaking, child care, or some other form of undercompensated service * * * the courts have held that the presumption of equal contribution is not overcome with respect to the spouse whose contribution is at least partly indirect and nonfinancial. In so holding, the courts have given effect to the legislature's intention in creating the presumption."

That is the circumstance here. Even though neither party made a substantial, targeted, contribution to the marital appreciation in the Vancouver property, wife's uncompensated contributions as a homemaker and caregiver for the parties' children have preserved, in the face of husband's

challenge, the presumption that she contributed equally to that appreciation.

■■     However, even if we are incorrect that husband did not rebut the presumption of equal contribution, we would reach the same result, because ORS 107.105(1)(f) requires that we make a just and proper division of the parties' assets. There are times when, despite the rebuttal of the presumption of equal contribution with respect to particular marital assets, equitable considerations nonetheless require us to divide that property more or less equally. Two such equitable considerations are the effect of a custody award of young children and a spouse's need for economic self-sufficiency. *See, e.g., Seefeld and Seefeld,* 294 Or 345, 350-51, 657 P2d 201 (1982); *Jenks and Jenks,* 294 Or 236, 243, 656 P2d 286 (1982). In both of those cases, the court determined that equity required consideration of a custody award and the custodial parent's need for economic self-sufficiency where the presumption of equal contribution was rebutted. Here, wife has few assets, a relatively modest income, no spousal support award, and two young children to care for and raise. Under the circumstances, it would be inequitable to skew the property division in the manner that husband proposes. Accordingly, we decline to disturb the trial court's disposition of the marital appreciation in value of the Vancouver property.

Overlapping, but somewhat different, considerations influence our disposition of the Harold Court property. That property, although separately owned by husband both before and throughout the marriage, became the family residence. However, the trial court did more than divide the marital appreciation in value of that property; rather, the court divided the entire value of that property, including husband's premarital equity of $118,234. Husband argues that the trial court erred in that division. He first notes that the value of the Harold Court property at the time of the marriage is properly viewed as marital property and only the increase in its value during the marriage is a marital asset. With respect to that increase in value, husband argues that he rebutted the presumption that wife contributed equally. He also argues that wife should not share in that increase because the parties' marriage was not a long-term marriage and

because he paid off the mortgage after the marriage with premarital assets that had not been commingled in the parties' marital finances.

■        The dissolution judgment listed the Harold Court property separately from the marital assets, indicating that the trial court also considered the premarital value of that property not to be a marital asset. We agree that the premarital value of the Harold Court property was not a marital asset. However, the marital appreciation in the value of that property was a marital asset to which the presumption of equal contribution attached.[5] For the same reasons set out in our discussion of the marital appreciation in the Vancouver property, we conclude that husband did not rebut the presumption that wife contributed equally to the marital appreciation in value of the family residence.

As noted, though, that does not end the discussion. In *Seefeld*, the court said:

" 'The equation of property division and the entitlement of a party to solely acquired property may be disturbed in order to accomplish broader purposes of a dissolution.' *Pierson and Pierson*, [294 Or 117, 123, 653 P2d 1258 (1982)]. A 'broader' purpose here is to divide the property so that the child can adequately be cared for.

"This does not mean that property should be divided differently simply because there are children to care for. Where the assets and foreseeable earnings available to the parties are reasonably sufficient to provide funds for the needs of the children, the proper division of property and the award of child support and spousal support should each be considered separately, dividing the property as may be 'just and proper' between the parties.

"Where earnings and assets are not sufficient to support the needs of the children as well as both parties, however, courts often cannot escape the necessity to determine which combination of support payments, property, and other

---

[5] The trial court determined, without distinguishing between husband's premarital equity and marital appreciation, that husband had not rebutted the presumption of equal contribution with respect to the Harold Court property.

sources of income will most effectively provide for the children. Frequently this results in an award of the family home to the custodial parent."

*Seefeld*, 294 Or at 351-52. In *Seefeld*, the residence was acquired during the marriage, but the husband had contributed approximately $11,000 in premarital assets to its acquisition. The Supreme Court awarded all of the marital equity in the residence to the wife but awarded the husband an offset for his contribution of premarital assets.

■      Here, the residence has been sold, and the question before us is how its proceeds should be divided. At the time of trial, husband had been unemployed for some time, and wife had been required, on limited income, to support herself and the children. Wife and the children need a home and the means to live. If not for husband's employment status, wife would otherwise likely be entitled to spousal support. We conclude that the trial court's division of the residence was just and proper in all the circumstances. It leaves husband with half of the total equity, subject to his obligations in bankruptcy, and it gives wife and the children a chance for a fresh start.

■      The remaining property division dispute centers on husband's second treasury bill account. For reasons that will soon be apparent, we address that issue together with husband's argument that the trial court erred in requiring him to pay a portion of wife's attorney fees. The account was established during the marriage, and, as such, it was a marital asset. However, wife does not assert that she contributed to the acquisition of the account and, thus, we have little trouble concluding that husband rebutted the presumption that she equally contributed to it. Husband argues that this treasury bill account, which was in his name alone, first was commingled with the family finances during the dissolution process. As noted, most of it was used to pay husband's attorney fees. The question is whether the account's preliquidation value is part of the marital estate and should have been charged to husband in the division of the marital estate, even though the account was later liquidated. We answer that question affirmatively. If the treasury bill account proceeds

were not included in the calculus, husband would have had his attorney fees paid from marital assets, whereas wife would not. We conclude that, for the same reasons described in our discussion of the Harold Court property, an equal division of those proceeds also is just and proper.

Accordingly, we will not alter the trial court's allocation of the value of the treasury bill account to husband, except to this limited extent: as noted, the evidence showed that husband paid $44,436 from the proceeds of that account toward his own attorney fees, not the full $51,000. As discussed, husband used a portion of the proceeds to pay family expenses and, to that extent, he should not be charged. As a consequence, we conclude that it is just and proper to reduce husband's assigned share of the assets by $6,564, the difference between the preliquidation value of the treasury bill account, $51,000, and the portion of the account that husband used to pay his attorney fees, $44,436. Accordingly, we vacate and remand the property division portion of the judgment with instructions for the trial court to subtract one-half of that difference, $3,282, from the equalizing judgment, for a revised total of $274,450.

However, we conclude that wife should be responsible for the payment of her own attorney fees. In dissolution cases, courts are authorized—but not required—to award attorney fees. ORS 107.105(1)(j) authorizes the trial courts to award "reasonable attorney fees and costs and expenses reasonably incurred." As the Supreme Court explained in *Haguewood and Haguewood*, 292 Or 197, 638 P2d 1135 (1981), the court in a dissolution action is not required to award attorney fees merely as a reward to the prevailing party. Instead, the court is to evaluate the financial resources of the parties, the property division made by the court's judgment, any orders of support, and the like in determining whether it would be equitable to assign to one party or the other the obligation to pay attorney fees. *Id.* at 212-13; *see also* ORS 20.075. This is a case where the property of the parties will be equally divided, and there is liquidity as a result of the sale of the Harold Court and Vancouver properties. In light of the other obligations that husband faces, the division of property and the parties' relative economic circumstances,

we conclude that an award of attorney fees to wife is inappropriate.[6]

Husband next asserts that the trial court erred in requiring him to execute a trust deed to secure his obligation to pay the equalizing judgment. The property was sold in an execution sale on wife's equalizing judgment, not as a result of the foreclosure of a trust deed. Because the property has been sold, husband has no further obligation to execute a trust deed or perform any obligations thereunder in connection with the Harold Court property. Because we have upheld the equalizing judgment and the Harold Court property has been sold, husband's complaint about the trust deed is now moot.

We turn to husband's assignment of error challenging the trial court's enhancement of his child support obligation based on the cost of the children's private school tuition. To place the parties' arguments in context, this case was tried over a period of several months, with a lengthy intervening recess. The trial was concluded on October 1, 2002, and, as discussed, the judgment was entered in December 2002. At that point, the children had already begun the school year at a school they had continuously attended—including pre-school—for several years. The older child was in second grade, and the younger child was in kindergarten. Wife submitted a proposed judgment to the trial court that set out her position with respect to the private school expense. In her child support worksheet, wife described the expense as "dependent needs." The body of the judgment, which the trial court adopted, provided:

"8.  The following factors have been taken into account in setting child support:

"* * * * *

"F.  It is in the best interests of the children to continue their enrollment in private school. To move the children from their current school * * * would cause substantial

_____

[6] That conclusion makes it unnecessary to consider husband's challenge to the trial court's reasoning in awarding wife a portion of her attorney fees. Suffice it to say that, even if we shared the trial court's view of the record regarding husband's position on the custody issue, it would not override the considerations that lead us to conclude that an award of attorney fees is not appropriate in this case.

trauma and would impair their ability to develop in a healthy manner, in part because of their attachment to the school, and in part because of budget cuts faced by the public schools. Under the circumstances of this case, the children's need for continued attendance at [the private school] constitutes a 'need of the children' under OAR 137-050-0330(2)(a)(G), and the cost of that tuition justifies an upward deviation of the presumed child support amount. The children's need to attend [the private school] will continue for at least during school years 2002-2003 and 2003-2004. Therefore, the cost of private education shall be shared equally by the parties for as long as the children attend private school."

Husband argues that the basic support as provided by the child support guidelines in OAR 137-050-0300 to 137-050-0595[7] was sufficient to provide for the educational needs of the children in the absence of a showing that the actual needs of the children justified additional support. *Cf. Wiebe and Wiebe*, 113 Or App 535, 537-38, 833 P2d 333 (1992) (citing Oregon Child Support Guidelines Commentary to relevant version of OAR 137-50-440). He contends that here there was no showing that the children had any needs that require private schooling, that the children would enjoy an excellent educational experience at a local neighborhood public school, and that he should not be required to contribute to the expense of their private school tuition. Husband relies on our decision in *Dawson and Dawson*, 142 Or App 35, 38-39, 919 P2d 517 (1996), where the obligor argued that the trial court exceeded the authority given to it by statute and rule when it deviated from the support guidelines without a finding that such deviation was necessary for the child.

OAR 137-050-0330 was the governing child support guideline rule when this case was tried. It provided, in part:

"(2)(a)  The amount of child support to be paid as determined in subsections (1)(a) through (1)(h) of this rule is presumed to be the correct amount. This presumption may be rebutted by a finding that the amount is unjust or inappropriate based upon the criteria set forth in subsections (2)(a)(A) through (2)(a)(P) of this rule. Both the presumed

---

[7] Unless otherwise noted, we cite the versions of the relevant rules that were in effect at the time of the dissolution trial.

correct amount and the new amount, in variance from the guidelines, shall be recited as part of findings which explain the reason for the variance.

"* * * * *

"(G)   The needs of the child including, but not limited to extraordinary child care costs due to special needs[.]"

We review *de novo* the trial court's determination that continued private education constituted a "need of the children" under OAR 137-050-0330(2)(a)(G) and that the cost of that tuition justified an upward deviation from the presumed child support amount. *Dawson*, 142 Or App at 38.[8]

The version of the rebuttal rule in effect when *Dawson* was decided, similarly to OAR 137-050-0330(2)(a)(G), authorized a court to consider as a rebuttal factor "the needs of the child including, but not limited to extraordinary child care costs due to special needs."[9] Here, unlike in *Dawson*, the trial court found that a deviation from the guidelines was necessary because removing the children from the school they were attending "would cause substantial trauma" and would "impair their ability to develop in a healthy manner, in part because of their attachment to the school, and in part because of budget cuts faced by the public schools."

The evidence showed that the children are intelligent and healthy and that they had no academic problems. However, wife expressed concern that the class sizes and teacher-to-student ratios in the private school—for second grade, 16 students with two certified teachers and one assistant; for kindergarten, 18 students, with one certified teacher and two assistants—were more favorable than those in the neighborhood public school, which averaged about 30 students. *See Dawson*, 142 Or App at 39 ("Class size, safety, and

---

[8] Wife did not rely on any other rebuttal factor in asking the trial court to deviate from the presumed guidelines support amount, and the trial court therefore did not address any other factor. Accordingly, we confine our analysis to whether the evidence justified a deviation under OAR 137-050-0330(2)(a)(G).

[9] Rebuttal factors that justify a deviation from the guidelines formula are now listed in OAR 137-050-0333. Subsection (1)(g) of that rule authorizes a court to consider the "extraordinary or diminished needs of the child."

religious training are legitimate concerns[.]"). Wife's pediatrician had told her that the children would be identified as talented and gifted, and she testified that, unless they had "great" teachers and principals in a public school, they would flourish more in the private school setting. Her position is that she was "sure they would do fine in a public school, but so much more opportunity and development and nurturing in the program they're in."

On the other hand, the evidence showed that the neighborhood public schools are in "high achieving" neighborhoods. Moreover, the custody evaluator did not strongly endorse the children's attendance at the private school. Although she testified that smaller class size would be an advantage to the children, the custody evaluator was unfamiliar with the curriculum at the private school and had not contacted it. She testified that "the issues raised by the father, his concerns about mother placing them in this school, I have to say is, to me, a difference of opinion, and that I have respect for both of these parents' opinions." Finally, there was no persuasive evidence that the children would have suffered any emotional injury by attending their neighborhood public school. In fact, the custody evaluator categorically stated that the children "don't have emotional problems, in my mind."

The issue before us, in light of ensuing events, is a narrow one: whether the additional expense of private schooling was required to meet the children's needs so that both parents should be obligated to share in it for the 2002-03 academic year.[10] We are satisfied on *de novo* review that the evidence showed that the children should not have been disrupted by a transfer to a different school during the school year in which the trial was concluded. Because they did not attend the private school thereafter, it is not necessary to

---

[10] In her brief on appeal, wife states that "[t]his issue is limited to a few months' of payments because the children ceased attending that school and the court modified the child support award effective September 1, 2003."

We take judicial notice of the trial court's order dated October 3, 2003, by which, effective September 1, 2003, it reduced husband's child support obligation to no longer provide for support based on private school tuition. *See* ORAP 8.45 (requiring parties to advise court of facts pertaining to possible mootness of an issue on appeal).

decide more than that. Accordingly, we do not disturb the trial court's determination that the expense of the children's private school attendance should be shared for the 2002-03 academic year. However, we vacate the judgment for school years thereafter on the ground of mootness.

We conclude our analysis with husband's challenge to the post-dissolution judgment holding him in contempt. Husband argues that the court erred in finding that his conduct was willful because (1) he held a good faith belief that he was not required to perform certain obligations that the dissolution judgment imposed on him while he was appealing from those obligations and (2) he lacked the ability to pay his financial obligations under the judgment. In a third argument, husband asserts that the trial court lacked authority to hold him in contempt for disobeying a provision of a marital dissolution judgment when an appeal from that judgment was pending.

We address jointly husband's challenges to the trial court's finding that he acted willfully in failing to pay his support obligations and failing to execute the trust deed. Husband's first and primary argument is that the trial court erred in finding that he acted willfully, by not taking "into consideration" that he believed in good faith that performing those obligations would result in the waiver of his appeal rights. At the threshold, we observe that husband's argument on appeal is different from the defenses that he asserted before the trial court. In his responsive pleading in the contempt proceeding, husband alleged separate affirmative defenses with respect to each specification of contempt in which he identically asserted that his performance of the obligation "would be deemed an action inconsistent with [husband's] assignment of error and hence a waiver." In other words, husband's defense before the trial court was based on the legal position that performance of the disputed obligations would amount to a waiver of his appeal rights. He did not allege in his pleading, nor did his attorney argue, that regardless of whether his legal position was correct, he acted on a good faith belief that it was. At the contempt hearing, husband testified that his appellate counsel had confirmed the correctness of his position; however, he testified that he had "already figured that out for [himself]." Moreover, his

testimony was given in the context of his ultimate assertion that he did not have "any choice in the matter, if I wish to appeal those items."

■ Before the trial court, husband relied on *Kelly v. Tracy*, 209 Or 153, 161, 305 P2d 411 (1956), where the court stated the familiar rule that "[a] party may waive the right to appeal by acquiescence in or recognition of the validity of a judgment or decree rendered against him." That principle is based on the premise that a party cannot claim the benefit of a judgment and at the same time appeal from it. *Pac. Gen. Contrs. v. Slate Const. Co.*, 196 Or 608, 611, 251 P2d 454 (1952). Additionally, the same rule has been held applicable, in limited circumstances, to a party who acquiesces in part of a judgment while attempting to appeal from the remainder. *Id.* The rule is predicated on the theory that the law will not allow an appellant to occupy an inconsistent position with regard to an appeal by accepting part of a judgment that the appellant seeks to overturn. *See Schlecht v. Bliss*, 271 Or 304, 308, 532 P2d 1 (1975). However, it is equally clear that husband could have performed his obligations under protest, that is, involuntarily, without waiving his appeal rights. Payment of a judgment will not preclude an appeal unless the payment was voluntary, not coerced, and made with a view of settlement. *Cottrell et ux. v. Prier et ux.*, 191 Or 571, 573, 231 P2d 788 (1951). Accordingly, husband's proffered legal excuse for nonperformance of his obligations was invalid.[11]

In support of its contempt determination, the trial court found that husband had not "credibly" taken the position that he lacked the capacity to perform those obligations. The court then appropriately focused on the validity of husband's legal defense. The court stated that husband had

> "taken the position that as long as he believes that his position on appeal would be compromised, he does not—is not required to obey a court order. I am unconvinced that obeying court orders until they are corrected on appeal constitutes a waiver of a right to appeal."

---

[11] Husband does not appear to challenge that conclusion on appeal. In his reply brief, he states that his " 'misunderstanding of the law' relating to waiver of his appeal rights was made in good faith" and that his "mistaken" belief was made in good faith.

The court then stated that it would give husband's attorney an opportunity to provide contrary authority if he believed that the court was mistaken in its understanding of the law. If mistaken, the court said, it would "reconsider my finding of contempt."[12] In the face of that invitation, husband did not suggest to the trial court that it had misunderstood his position or that, alternatively, he had acted in good faith even if his position was mistaken.

In the ensuing contempt order, the trial court found as fact that "[p]etitioner has proved by clear and convincing evidence that [husband] is in willful contempt" of the dissolution judgment for failing to pay child support and spousal support and refusing to execute the trust deed. In addition, the court expressly rejected husband's affirmative defenses.

Our review is for "any evidence" to support the trial court's finding that husband acted willfully. *Polygon Northwest v. NSP Development, Inc.*, 194 Or App 661, 669-70, 96 P3d 837 (2004). We defer to the trial court's express and implied credibility findings in determining that husband's conduct was willful. *Smith v. Department of Corrections*, 112 Or App 556, 560, 829 P2d 710 (1992) (deferring to trial court's express and implied credibility findings in a contempt proceeding). As discussed, husband did not prove his pleaded affirmative defenses, he did not call as a witness the attorney whose advice he claimed had confirmed his defenses, and the trial court found that he did not "credibly" show that he was incapable of performing his obligations under the dissolution judgment.[13] We conclude that there is evidence to support the trial court's finding that husband's failure to perform those obligations was willful.

Husband's argument that the trial court lacked authority to enforce his obligations while the appeal was pending is equally unavailing. In the absence of a stay, the

---

[12] Husband does not assert that he accepted the court's invitation, and we find no indication in the record that he did so.

[13] Husband testified that if he were "not going to appeal the order, I would comply with all the components of the order." We reject without further discussion husband's contention that there was no evidence to support the trial court's finding that he had not shown that he was incapable of performing those obligations.

trial court had the authority to enforce the dissolution judgment during the pendency of husband's appeal from it. ORS 19.270(1)(b). Moreover, under ORS 33.015(2)(b), a trial court can enforce, by exercise of its contempt power, an order or judgment directing a party to perform a specific act, including the performance of obligations under ORS 107.105.

Provisions in dissolution judgment related to property division vacated and remanded with instructions to reduce equalizing judgment to $274,450; spousal support award reversed; attorney fee award reversed; dissolution judgment otherwise affirmed; contempt judgment affirmed.