Argued and submitted February 15, affirmed June 14, 2006

STATE ex rel
CROWN INVESTMENT GROUP, LLC,
an Oregon corporation,
*Appellant,*

*v.*

CITY OF BEND,
an Oregon municipal corporation,
*Respondent.*

04CV0434AB; A126740

136 P3d 1149

Peter Livingston argued the cause for appellant. With him on the briefs were Donald Joe Willis, Arusi R. Loprinzi, and Schwabe, Williamson & Wyatt, P.C.

Peter M. Schannauer argued the cause for respondent. With him on the brief were James H.B. Forbes and Forbes & Schannauer, LLP.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

SCHUMAN, P. J.

---

* Landau, J., *vice* Ceniceros, S. J.

## SCHUMAN, P. J.

Crown Investment Group, LLC, (Crown) brought a mandamus action seeking to compel the City of Bend to issue a permit allowing Crown to demolish a historic building that it owned. Without waiting for the court to decide the mandamus, however, Crown went ahead and demolished the building without a permit. The trial court imposed a remedial contempt sanction of $100,000. Crown appeals. The appeal has no merit. We affirm.

Crown owned a Bend landmark known as the Crane Shed. Constructed in 1937, the building originally played an important role in the local timber industry but later fell into disuse and, in recent years, served mostly as a monumental reminder of that industry. It was placed on the city's inventory of historic resources protected under Goal 5, the statewide planning standard that requires protection of natural resources and conservation of scenic and historic areas and open spaces. *See* OAR 660-023-0200 (governing historic resources); OAR 660-023-0030 (describing inventory process).

Concerned about the building's disrepair and attendant safety and liability issues, and pursuant to plans to build a multi-use development on the site, Crown applied to the city for a permit to demolish the shed. The city held four hearings on the application, attracting public debate about whether the historic building should be restored, memorialized, or demolished. On August 9, 2004, Crown brought an action seeking a writ of mandamus to compel the city to approve its application pursuant to ORS 227.179(1), which permits such actions where the city does not take final action on a permit application within 120 days. The court issued an alternative writ of mandamus on that day, ordering the city to issue the permit or, at a hearing scheduled for August 30, to show cause why it had not done so.

Before that hearing, on August 19, the local newspaper reported that an assistant city attorney had "reviewed the evidence and found that the city historic code does not protect historic buildings from demolition." When officers of Crown saw that report, they concluded that approval of the

permit was a mere formality but, based on rumors and anonymous phone calls, they also feared that their ability to act on the permit would be delayed by litigation. Motivated by that fear and by fear that they could be held liable if the building collapsed and injured somebody—fears about which they chose not to consult their attorneys—they decided to demolish the building at once. They did so that evening, well before the scheduled August 30 mandamus hearing where the court would have decided whether to allow that action.

The city then filed a motion in the mandamus action for a remedial contempt sanction. At the contempt proceeding, the city offered expert testimony concerning the historic value of the Crane Shed and measures that the city could have adopted to mitigate the loss of that value, including preservation of parts of the architecture and establishment of a public exhibition or memorial. Those measures, the city contended, could have been imposed as conditions on the issuance of a demolition permit, had the mandamus proceedings been held. The city argued that $150,000 would be required to implement any mitigating measures that remained available now that the building had been summarily destroyed.

The court found that Crown

"acted quickly to demolish the building immediately, in part to prevent anyone from taking any legal action that would delay or prevent the demolition of the building, or to seek conditions for the demolition of the building, including legal action in this very case—the mandamus action which was set for a hearing 11 days later. [Crown] simply decided to go ahead and demolish the building in defiance of the jurisdiction, authority and process of this court."

As a sanction, the court ordered Crown to pay the city $100,000 to be used exclusively for measures designed to mitigate the loss of the Crane Shed and memorialize it as a historic site:

"Under ORS 33.015 a remedial sanction, again, under the circumstance of this case, would be a sanction that would compensate for injury, damage or costs resulting from a past contempt of court. * * * [T]he actions by [Crown]

in contempt of this court and in avoidance of these legal proceedings, deprive[d] the City of Bend and other interested parties [of] the opportunity to seek an order from this court with regard to a number of conditions * * *, including conditions that would have provided that the historical character of the building would be preserved to the extent reasonably possible. * * *

"I am finding * * * that a remedial sanction in the amount of $100,000 is appropriate * * *. This remedial sanction should be paid to the City of Bend. These funds should be used only for the purpose of designing, establishing and maintaining an appropriate memorial or historic site or display to be held in a special account solely for this purpose."

Thereafter, the parties submitted, and the court accepted, a joint motion for entry of a writ of mandamus under which the city would issue the demolition permit on condition that Crown demonstrate a satisfactory asbestos cleanup (ultimately no asbestos was found) and convey minor historic artifacts to the city.

■ On appeal, Crown's principal argument is that, under ORS 33.015(4),[1] no remedial sanction was authorized because the city suffered no injury, damage, or costs as a result of the demolition. The argument begins with the premise that unambiguous laws compelled the city to issue an unconditional demolition permit. From that premise, according to Crown, it follows that premature demolition merely brought about an inevitable consequence. Further, although that consequence occurred prematurely, the prematurity itself caused the city no harm; had Crown awaited the outcome of the hearing, nothing would have been different. Because Crown caused no harm, the sanction was unlawful.

Crown presents two versions of this argument. In the first, it argues directly that the contempt sanction was unlawful because the city suffered no injury, damage, or costs. In the second, Crown asserts that the trial court erred by not deciding the underlying mandamus action before

---

[1] ORS 33.015(4) provides:

" 'Remedial sanction' means a sanction imposed to terminate a continuing contempt of court or to compensate for injury, damage or costs resulting from a past or continuing contempt of court."

deciding the contempt motion because, if the court had decided the mandamus first, it would necessarily have decided it in Crown's favor, thereby precluding remedial contempt because, again, the city would have suffered no harm. In either guise, the argument is wrong.

That is so because it stems from an erroneous presumption: that the city suffered no injury because the court was absolutely required to issue an unconditional demolition permit in any event. In fact, the court had the authority to refuse to issue the mandamus or issue it with conditions. ORS 227.179(5) requires a court to

> "issue a peremptory writ [requiring a city to take final action on a land use application] unless the governing body or any intervenor shows that the approval would violate a substantive provision of the local comprehensive plan or land use regulations. * * * The writ may specify conditions of approval that would otherwise be allowed by the local comprehensive plan or land use regulations."

The relevant local regulation establishes criteria that the Landmarks Commission must consider, for example, "[w]hether there is a viable economic use for the structure as it exists" and "[w]hether there is a feasible means of rehabilitation." Bend Code, Chapter 10-17, § 10.116(4)(e), (f). The regulation then provides, "The Landmarks Commission *may* approve the demolition request after considering [those] criteria * * *." Bend Code, Chapter 10-17, § 10.116(5) (emphasis added). Crown does not explain, and we are unable to determine, why ordering the city to issue a demolition permit might not violate those regulations if, for example, the commission considered the criteria and decided *not* to issue a permit. Further, nothing in the code prohibits granting a permit with conditions. Thus, Crown's mandamus action and the city's permit process could have resulted in a conditional permit or an outright denial. In fact, the process did result in a conditional permit and, had Crown not indulged in self-help, more or different conditions might have been imposed.

However, we need not speculate about how the court would have resolved the litigation if Crown had not demolished the building prematurely. Even if we were to conclude

that the outcome of the hearing was foreordained, that conclusion would not mean that the city suffered no remediable injury. The injury to the city consisted not only in losing the historic building or artifacts from it, but also in losing the opportunity to contest the demolition through the courts—to avail itself of the rules and procedures duly established by the political community to resolve disputes. The city might have prevailed or it might have lost, but injury occurred nonetheless. Crown's theory—that self-help inflicts no harm if it merely anticipates what a court will do—cannot be reconciled with the rule of law that underlies, indeed that defines, civil society.

■ Crown also maintains that, even if its actions harmed the city, the $100,000 sanction was unlawful because it was "in excess of any injury, damage or costs suffered by defendant." We disagree. ORS 33.105(1) authorizes a court to impose "one or more" of several listed remedial sanctions, including

"(a) Payment of a sum of money sufficient to compensate a party for loss, injury or costs suffered by the party as a result of a contempt of court.

"* * * * *

"(f) A sanction other than the sanctions specified in paragraphs (a) to (e) of this subsection if the court determines that the sanction would be an effective remedy for the contempt."

Evidence supports the court's finding that "$100,000 is appropriate" to compensate the city for losing "the opportunity to seek an order from [the] court with regard to a number of conditions * * *, including conditions that would have provided that the historical character of the building would be preserved to the extent reasonably possible." *See Polygon Northwest v. NSP Development, Inc.*, 194 Or App 661, 670, 96 P3d 837 (2004) (review of factfinding in contempt proceedings is for "any evidence to support the findings"). The unlawful demolition of the Crane Shed possibly deprived the city of the building's value as a historical asset, and testimony at trial put the cost of a scale model that might serve the same historic purpose at $132,000.

■    Finally, Crown argues that no remedial sanction was appropriate because no contempt occurred, as that term is defined in ORS 33.015(2): "Disobedience of, resistance to or obstruction of the court's authority, process, orders or judgments." Again, we disagree. At the least, Crown's deliberate decision to execute an action, the legality of which was still pending in court, was an obstruction of the court's authority and process. Crown committed a flagrant contempt. In doing so, it injured the city. The remedial sanction imposed by the court was within its discretion.

Affirmed.